[Civ. No. 9450.  Third Dist.  June 4, 1959.]

JOHN M. TOMCHIK et al., Appellants, v. CHARLES W. JULIAN et al., Respondents.

Daniel C. Miller and James D. Boitano for Appellants.

Rutherford & Rutherford and Mark Stanton for Respondents.

SCHOTTKY, J.—John M. Tomchik and Cecilia K. Tomchik brought this action to recover damages for the death of their daughter Elaine from carbon monoxide poisoning and for injuries sustained when they were overcome by carbon monoxide gas. They have appealed from the judgment entered after a jury returned a verdict in favor of the defendants Charles W. Julian and Edith L. Julian, his wife, and Joseph Bell and his wife, Dora Bell.

. The record shows that the Tomchiks purchased a six-room house in December, 1952, from Charles W. Julian and Overton

J. Fitzgerald (Mr. Fitzgerald was not served with summons and was not a party to the action), the general contractors who had erected the house. The house was heated by means of a forced-air gas-type furnace located in a closet three feet by four feet off of the hall near the center of the house. This furnace was installed by the defendant Joseph Bell.

The Tomchiks had occupied the house for a period of two years when about 5 p.m. on November 10, 1954, a George Potter entered the house and found the family ill and Elaine dead. The family had been overcome by carbon monoxide gas. The daughter, Elaine, died from carbon monoxide poisoning. There is no question that the Tomchiks inhaled carbon monoxide fumes. The only question is what caused the fumes to be disseminated through the house.

Robert Mendell, plaintiffs' expert, investigated the matter as part of his official duties as an industrial hygiene engineer for the Department of Public Health of the State of California. He conducted tests which showed that because of a warped inspection door in the furnace carbon monoxide gas was moving from the chimney to the furnace room and then to the blower and from the blower to various rooms of the house.

The gas furnace in the house had a BTU input per hour of 100,000. Heated air was distributed to various rooms by means of a blower which forced the air through ducts leading to grilles in the various rooms. The intake air for the furnace was obtained from two floor grilles. One was located in the hallway about 5 feet from the furnace and the other in the living room. The only air inlet in the closet was a crack under the door. An exhaust duct was provided for carrying the products of combustion to the outside air by means of natural convection. A draft diverter was located in this exhaust duct.

Mr. Mendell found that a dust filter underneath the furnace in the intake air duct showed a heavy accumulation of dust. The inspection door on the furnace was. warped and the locking mechanism on the handle was missing.

When Mendell was conducting his tests he noted that air rushed into the blower of the furnace through the warp in the door. He also noticed that some of the products of combustion instead of going up the chimney were coming back into the closet and then into the furnace blower from which it was distributed to the various rooms of the house. Mr. Mendell concluded that after the furnace had been operating for a while the oxygen in the furnace closet was reduced

with the result that poor combustion took place which resulted in a higher production of carbon monoxide gas. He also was of the opinion that the condition was affected because there were no air vents cut into the floor and ceiling as required by the building code. The expert testified that if the cover plate on the furnace had not been bent the accident could not have happened. He also said, in effect, that it would not have happened if the vents had been put in.

The building code required that a fresh air supply of not less than one square inch for each 1,000 BTU maximum input rating be provided for all gas furnaces. However, the building inspector was authorized to approve any alterations, provided he found that the alternative was the equivalent of that provided in the code. There is no showing that a variance was approved. The house was approved by the building inspector. There was testimony later that the crack under the door would provide sufficient combustion air.

Appellants contend that the trial court committed reversible errors in several instructions given to the jury. The first instructions attacked by appellants read as follows:

"It is claimed by plaintiffs that there was negligence in the installation of a gas furnace in plaintiff's residence.

"It appears from the evidence that the death or illness, if any, of which plaintiffs complain occurred after the installation of said gas furnace and after the same had been accepted by the builder and after sale to plaintiffs . . . and when said furnace was no longer under the control of . . . defendants.

"Before you may hold defendants (BELL) liable, there are certain findings you must make and they must be supported by a preponderance of the evidence. They are:

"First: that the work done in the installation of the furnace was so negligently done as to be imminently dangerous to third persons.

"Second: that defendants (BELL) knew, or in the exercise of ordinary care should have known, of the defective condition, if any, and its incident danger, and negligently failed to correct such defect, if any you find there was.

"Third: that plaintiffs did not know of the defective condition and could not have discovered it by reasonable inspection in the exercise of ordinary care.

"Fourth: that said defective condition was the proximate cause of the injury of which plaintiffs complain."

"I instruct you that it is a general rule of law that a building or construction contractor is not liable for his negligence resulting in injury or damage to such third person after the completion of the work and acceptance thereof by the owner. However, there is an exception to this rule as follows: That if the contractor does defective work which renders the instrumentality inherently dangerous, he becomes liable in damages to a third person injured as the proximate result of such defect if the contractor knew, or, under the particular circumstances, should have known, that the instrumentality was delivered to the owner or contractor in a condition that was imminently dangerous to third persons and in a condition in which a reasonable inspection would not have revealed such defect or danger to said third person."

The statement in the second instruction "that it is a general rule of law that a building or construction contractor is not liable for his negligence resulting in injury or damage to such third person after the completion of the work and acceptance thereof by the owner" is clearly erroneous. For, as held in the syllabus of the recent case of *Dow* v. *Holly Manufacturing Co.*, 49 Cal.2d 720 [321 P.2d 736], "The rule that a general contractor is not liable for injuries to third persons resulting from his negligence in construction of the work after the work is completed and accepted by the owner, because of lack of privity of contract, is no longer the law; the modern tendency is to hold building contractors to the general standard of reasonable care for the protection of anyone who may foreseeably be endangered by negligence, even after acceptance of the work."

Furthermore, the statement in the instant case that before the jury could hold defendants liable they must find that the work was so negligently done as to be *imminently dangerous* to third persons, without any definition of "imminently dangerous," could well lead the jury to believe that the phrase meant something that was bound to occur immediately. In view of the lapse of time between the installation and the accident, this portion of the instruction could hardly fail to be prejudicial to plaintiffs.

The third instruction challenged by appellant was one on unavoidable accident. Respondent concedes that this instruction was erroneous, but contends that it was not reversible error. The sole question is whether the error was prejudicial, and the question of prejudice must be decided on the facts of each case. In the recent case of *Butigan* v.

*Yellow Cab Co.*, 49 Cal.2d 652 [320 P.2d 500], and several later decisions, the giving of the instruction was held to be reversible error. In the Butigan case the court said at pages 660-661:

"The instruction is not only unnecessary, but it is also confusing. When the jurors are told that 'in law we recognize what is termed an unavoidable or inevitable accident' they may get the impression that unavoidability is an issue to be decided and that, if proved, it constitutes a separate ground of nonliability of the defendant. Thus they may be misled as to the proper manner of determining liability, that is, solely on the basis of negligence and proximate causation. The rules concerning negligence and proximate causation which must be explained to the jury are in themselves complicated and difficult to understand. The further complication resulting from the unnecessary concept of unavoidability or inevitability and its problematic relation to negligence and proximate cause can lead only to misunderstanding.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

". . . In this connection, for example, we should keep in mind the tendency which such an instruction would have to induce the jury to believe that the stalling of the taxi engine, if a fact, was an unavoidable occurrence, that it caused the accident and that, accordingly, no one should be held liable. The jury may thus have been led to disregard the permissible inferences that the company was negligent in not properly maintaining the taxi and that its driver was negligent in that he did not take proper precautions in view of his knowledge that the engine had previously stalled. Under all the circumstances, the record indicates that the error of the court in giving the instruction was prejudicial."

See also *Emerton* v. *Acres*, 160 Cal.App.2d 742 [325 P.2d 685] ; *Grant* v. *Mueller*, 160 Cal.App.2d 804 [325 P.2d 680].

We are unable to reach any other conclusion than that on the record before us the giving of an instruction on unavoidable accident must be held to have been prejudicial to appellants.

Respondents seek to avoid the prejudicial effect of the above quoted instruction by arguing that the evidence shows conclusively that the "proximate cause" of the accident "was the 2" to 2½" warp in the door or coverplate caused by plaintiffs after delivery of possession of the house and furnace by defendants to plaintiffs."

John Tomchik testified that neither he nor his family ever removed the door or made any change in it. This is sufficient to sustain a finding, if one were made, that the furnace coverplate or door was defectively installed. There is also testimony from which it could be found that the failure to install the vents in the floor and ceiling was the cause of the accident.

Respondents' argument, in effect, is that upon the record in the instant case it must be held as a matter of law that the negligence of appellants was the proximate cause of the accident. However, respondents' repeated assertions that appellant John Tomchik committed deliberate perjury only accentuates the conflict in the evidence. We are convinced that if the judgment had been in favor of appellants the record would support it.

No other points raised require discussion.

The judgment is reversed.

Van Dyke, P. J., and Peek, J., concurred.